An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-311

Filed 19 November 2025

Chatham County, Nos. 21JT000004-180, 21JT000005-180, 21JT000006-180

IN RE: A.D., H.D., T.D.,

Juveniles

Appeal by respondent-father by petition for writ of certiorari from orders entered 15 November 2024 by Judge Sherri Murrell in Chatham County District Court. Heard in the Court of Appeals 28 October 2025.

> *Stephenson & Fleming, LLP, by Jane R. Thompson, for petitioner-appellee Chatham County Department of Social Services.*
>
> *Elon University School of Law Appellate Advocacy Clinic, by Alan D. Woodlief, Jr., for guardian ad litem.*
>
> *Patricia M. Propheter for respondent-appellant father.*[1]

ZACHARY, Judge.

Respondent-appellant Father appeals from the trial court's three orders terminating his parental rights to his minor children Alicia, Heather, and Travis

---

[1] Appellate counsel for Father signed the appellant brief "Attorney for Respondent-Mother." However, Mother is not a party to this appeal, and other filings, including the certificate of filing and service of the brief, establish that Ms. Propheter is appellate counsel for Father.

(collectively, "the juveniles").[2] After careful review, we affirm the trial court's orders.

## I. Background

On 10 February 2021, the Chatham County Department of Social Services ("DSS") filed three juvenile petitions alleging Alicia to be an abused, neglected, and dependent juvenile and Heather and Travis to be neglected and dependent juveniles. The petitions alleged that the juveniles had been residing with Father in Georgia; he was caring for them following their mother's post-partum depression after giving birth to Alicia.[3]

According to the petitions, on 6 November 2020, the Fulton County (Georgia) EMS was dispatched to Father's house "due to [Alicia] choking," at which time EMS staff noticed what appeared to be non-accidental bruising on Alicia's neck and cheek. Alicia was hospitalized, where she was found to have multiple healed rib fractures; lesions on her inner thigh; and bruising to her left eye, lower back, shoulders, and mouth. Hospital staff contacted Mother, who "arrived to bring the juveniles back to North Carolina." Father was arrested and charged with second-degree cruelty to children. When Child Protective Services ("CPS") agents met with the family, they observed scarring on Travis's chest; Travis stated that "Daddy did it" and "Daddy

---

[2] The pseudonyms to which the parties stipulated are used to protect the identities of the juveniles. *See* N.C.R. App. P. 42(b).

[3] On 22 January 2024, Mother voluntarily relinquished her parental rights for the purpose of facilitating adoption. As she is not a party to the appeal, the background addresses her involvement in this case only as necessary.

threw us." During Travis's child medical examination, he also disclosed that Father had punched him and Alicia in their stomachs and slapped Alicia.

Soon after the juveniles returned to North Carolina, Mother was unable to care for them. On 10 February 2021, the trial court granted nonsecure custody of the juveniles to DSS.

The trial court conducted an adjudication hearing on 25 March 2021. Alicia was adjudicated abused, and all three juveniles were adjudicated neglected and dependent. Following its 15 April disposition hearing, the court ordered that DSS make reunification efforts.

Father was released from the Fulton County jail on 29 April 2021 and contacted DSS on 29 June; however, the CPS agent to whom these cases were assigned was unable to speak to him. In orders entered in November 2021 and March 2022, the trial court found that Father was not participating in or cooperating with any case plan but was otherwise cooperative and communicating with DSS. Father was prohibited from having either direct or indirect contact with the juveniles, due to his criminal charges. However, Father successfully petitioned to have his bond conditions changed in March 2022, and he began weekly virtual visitation with the juveniles. He also reported that he completed a mental-health assessment in June 2022, although at that time, the CPS agent had not received documentation to this effect.

On 17 March 2023, a Fulton County grand jury indicted Father for first-degree

cruelty to children; he pleaded guilty to this charge in September 2023. He was sentenced to a ten-year term of probation, which included the condition that he was prohibited from leaving the State of Georgia without permission from his supervising probation officer.

On 12 September 2023, DSS filed motions to terminate Father's parental rights to the juveniles, alleging grounds of neglect, willful failure to make reasonable progress in alleviating the conditions that led to the juveniles' removal, and failure to establish paternity.

The motions to terminate came on for hearing on 26 September 2024. On 15 November 2024, the trial court entered separate termination orders for Alicia, Heather, and Travis, concluding that grounds existed to terminate Father's parental rights in that the juveniles were neglected and that Father had willfully left the juveniles in foster care for more than 12 months without making reasonable progress toward correcting the conditions that led to their removal from the home. The court further concluded that termination of Father's parental rights was in the juveniles' best interests and terminated his parental rights.

In its orders, the court made numerous detailed findings regarding Father's circumstances at the time of the hearing. Among others, the court found that although Father reported that he had scheduled therapy sessions in October 2023, he never reported completing the sessions, nor was DSS able to confirm that he did. Father was permitted to exercise virtual visitation with the juveniles, but the

consistency of these visits decreased between the entry of his guilty plea and the January 2024 permanency planning session. The court further found that although Father could have requested that his probation be modified to allow him to travel to North Carolina to visit the juveniles, he never made that request; moreover, he never took responsibility for the injuries caused to the juveniles; he had not taken anger-management classes; and it was "unknown whether his parenting classes for probation sufficiently addressed the risk of him caring for the juvenile[s]."

Father gave notice of appeal on 30 December 2024.

## II.    **Appellate Jurisdiction**

On 13 June 2025, DSS filed a motion to dismiss Father's untimely appeal. On 18 June 2025, Father filed a petition for writ of certiorari requesting that this Court review the termination orders.

In "cases governed by subchapter I of the Juvenile Code," parties must file an appeal in accordance with the provisions of N.C. Gen. Stat. § 7B-1001(b) and (c). N.C.R. App. P. 3.1(b) (capitalization omitted). Section 7B-1001(b) provides that "[n]otice of appeal . . . shall be made within 30 days after entry and service of the order." N.C. Gen Stat. § 7B-1001(b) (2023).

In the instant case, DSS served Father's attorney of record with the termination orders on 25 November 2024, but Father's counsel did not file Father's notice of appeal until 30 December 2024; thus, as Father concedes, notice of appeal was untimely.

"A timely notice of appeal is required to confer jurisdiction upon this Court." *Raymond v. Raymond*, 257 N.C. App. 700, 703, 811 S.E.2d 168, 170 (2018). However, where "the right to prosecute an appeal has been lost by failure to take timely action," this Court may issue a writ of certiorari in "appropriate circumstances" to "permit review of the judgments and orders of trial tribunals." N.C.R. App. P. 21(a)(1). We have held "that an appropriate circumstance to issue writ of certiorari occurs when an appeal has been lost because of a failure of [the appellant's] trial counsel to give proper notice of appeal." *In re J.C.B.*, 233 N.C. App. 641, 645, 757 S.E.2d 487, 490 (cleaned up), *disc. review denied*, 367 N.C. 524, 762 S.E.2d 213 (2014).

Father's notice appeal was filed one day late, due to his trial counsel's failure to take timely action. We note, however, that although his attorney failed to file the notice of appeal until 30 December 2024, rendering the appeal untimely, Father signed the notice of appeal on 17 December 2024, well within the 30-day window for taking appeal. All other aspects of Father's appeal have been timely, and considerable effort has been expended on his behalf by his appellate counsel. Therefore, in our discretion, we allow Father's petition for writ of certiorari and deny DSS's motion to dismiss the appeal.

### III.  Discussion

Father raises two issues on appeal: whether the evidence and findings of fact supported the trial court's determinations of neglect and failure to make reasonable progress. For the following reasons, we conclude that the unchallenged findings of

fact support the conclusion that the juveniles were neglected.

## A. <u>Standard of Review</u>

"We review a trial court's adjudication under [N.C. Gen. Stat.] § 7B-1109 to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re K.H.*, 375 N.C. 610, 612, 849 S.E.2d 856, 859 (2020) (cleaned up). When "the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary. Unchallenged findings of fact are conclusive on appeal and binding on this Court. We review the trial court's conclusions of law de novo." *In re C.M.P.*, 254 N.C. App. 647, 654, 803 S.E.2d 853, 858 (2017) (cleaned up).

"After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen Stat. § 7B-1110(a). "The trial court's dispositional findings are binding on appeal if supported by the evidence received during the termination hearing or not specifically challenged on appeal." *In re K.N.L.P.*, 380 N.C. 756, 759, 869 S.E.2d 643, 646–47 (2022). We defer to the trial court's decision to terminate parental rights unless that determination was "manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 759, 869 S.E.2d at 646 (citation omitted).

## B. <u>Adjudicatory Hearing on Termination</u>

On appeal, Father challenges both grounds underlying the trial court's

termination of his parental rights to the juveniles. However, "[b]ecause only one ground is necessary to terminate parental rights, we only address [Father]'s arguments regarding the ground of neglect." *In re M.A.*, 378 N.C. 462, 466, 862 S.E.2d 169, 173 (2021).

"A trial court may terminate parental rights when it concludes the parent has neglected the juvenile within the meaning of [N.C. Gen. Stat.] § 7B-101." *Id.*; *see* N.C. Gen. Stat. § 7B-1111(a)(1). For the purposes of § 7B-1111(a)(1), a "[n]eglected juvenile" is defined, in pertinent part, as "[a]ny juvenile . . . whose parent, guardian, custodian, or caretaker . . . [d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15)(a), (e).

"[A] prior adjudication of neglect is admissible in subsequent proceedings to terminate parental rights for neglect." *In re Byrd*, 72 N.C. App. 277, 280, 324 S.E.2d 273, 276 (1985). Yet, "[a]lthough a prior order of neglect is admissible in subsequent proceedings, the prior order alone is not determinative on the issue of neglect, and the trial court must make an independent determination of whether neglect authorizing the termination of parental rights existed at the time of the hearing." *Id.* Where neglect cannot be shown "at the time of the termination hearing because the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re Z.V.A.*, 373 N.C. 207, 211–12, 835 S.E.2d 425, 429 (2019) (cleaned up).

1. <u>**Prior Neglect**</u>

Here, the trial court found that grounds existed to terminate Father's parental rights under § 7B-1111(1), determining that the juveniles did "not receive the proper care, supervision, or discipline from [their] parent and live[d] in an environment injurious to [their] welfare." In addition to making extensive findings on this issue—some of which are summarized above—the trial court noted that all three juveniles were "adjudicated neglected by this [c]ourt in an order entered from a hearing held 25 March 2021" and that it was "likely that the neglect experienced by the juvenile[s] in the care of [Father] will repeat or continue if the juvenile[s] [are] returned to [Father]'s care and custody."

Father argues against a finding of prior neglect. He first contends that "the court relied heavily on the Findings of Fact from the Custody Adjudication Order from years earlier on 25 March 2021"; he notes that "[t]hese findings were based on stipulations of [M]other in 2021, but [Father] was incarcerated at the time and was not present at the hearing and did not consent nor stipulate to these facts." To the extent that Father is arguing that the trial court erred by incorporating elements of the previous order, he is incorrect. He candidly admits that he "is not suggesting that the Adjudication Order from 2021 is before this Court, as the time for appeal is long past," nor does he argue that he was denied the opportunity to appeal this previous order. Any error he alleges based on his lack of stipulation to the facts in the 25 March 2021 order is therefore overruled.

Father next argues that "the previous neglect was at the hands of . . . [M]other who has relinquished her rights and is no longer a party. There were no previous allegations of neglect as to [Father] and [DSS] failed to prove past neglect by [Father]." Both contentions are incorrect.

In the 25 March 2021 order, the trial court found that the juveniles were neglected "in that they . . . do not receive proper care, supervision or discipline from their *parents*." (Emphasis added). The court determined that both Father and Mother were neglectful of the juveniles. Thus, there was no need for DSS to prove past neglect during the termination hearing when the trial court had found neglect three years earlier, with the previous findings of neglect included in DSS's motions for termination of parental rights. In addition, while Father blames Mother for any previous neglect, his physical abuse of Alicia while her brother and sister resided in the same home also constituted neglect, as the court found: "[F]ather has done nothing to address this [c]ourt's adjudicatory finding of [Alicia's] abuse[, which] specif[ied] that he created or allowed to be created a substantial risk of serious physical injury to the juvenile[s] by other than accidental means." In that circumstance, the juveniles did not receive "proper care, supervision, or discipline" from their Father and he "created a living environment that [wa]s injurious to the juvenile[s'] welfare." N.C. Gen. Stat. § 7B-101(15) (a), (e).

Finally, Father contends that "the trial court [sought] to get around [the] requirement of prior neglect" by using the abuse of Alicia as prior neglect, as

evidenced by the trial court's statements at the hearing and Finding of Fact 81, which Father characterizes as an abuse of discretion. What Father fails to acknowledge, however, is that the court's statement and Finding of Fact 81 were unrelated to the finding of prior neglect, but rather were part of the trial court's finding of lack of reasonable progress. Accordingly, we conclude that the trial court did not err by finding that Father previously neglected the juveniles.

## 2. **Likelihood of Future Neglect**

Although not explicitly, Father appears to challenge the trial court's finding that there was a likelihood of the juveniles' future neglect, contending that the "trial court erred when it denied [Father's] right to fundamentally fair procedures by using his pretrial incarceration and resulting conditions of bond and probation as a sword in its determination of grounds for termination of parental rights."

Indeed, the trial court was forbidden from using Father's incarceration as a sword against him during proceedings to terminate his parental rights. On appeal, however, Father attempts to use his incarceration as a shield, an equally forbidden strategy: "Our precedents are quite clear—and remain in full force—that incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re M.A.W.*, 370 N.C. 149, 153, 804 S.E.2d 513, 517 (2017) (cleaned up). "[O]ur decisions concerning the termination of the parental rights of incarcerated persons require that courts recognize the limitations for showing love, affection, and parental concern under which such individuals labor while

simultaneously requiring them to do what they can to exhibit the required level of concern for their children." *In re J.A.J.*, 381 N.C. 761, 770, 874 S.E.2d 563, 571 (2022) (citation omitted).

In the instant case, the trial court made numerous findings of fact—all of which are unchallenged on appeal—which were sensitive to Father's limitations resulting from his incarceration and probation while nevertheless supporting a conclusion of a likelihood of future neglect.

The trial court found the following with regard to the likelihood "that the neglect experienced by the juvenile[s] in the care of [Father] will repeat or continue if the juvenile[s] [are] returned to [Father]'s care and custody":

> [F]ather's Family Services Agreement from February 2022 identified parenting as a need to be addressed. . . . [F]ather did not comply with this requirement until June 2024. . . . [F]ather did not comply with the order to participate in parenting education until the criminal judgment was rendered and participation in a parenting course was ordered as a condition of his probation.
>
> [F]ather was ordered to participate in a mental health assessment and participate in biweekly therapy. . . . [F]ather has not participated in therapy.
>
> [F]ather remains in Georgia and with the same supports in place as when the juveniles resided with him and in which the injuries to [Alicia] occurred. Almost nothing has changed.
>
> There were injuries to the juvenile, [Travis], at the same time that [Alicia] was injured. [Travis] attributed these injuries to actions by . . . [F]ather.

. . . .

> [F]ather never completed a parenting class that satisfied [DSS] or [the State of] Georgia.
>
> [F]ather never requested that the juvenile[s] . . . be brought to Georgia to visit with him.
>
> The juveniles have been in foster care for 1,342 days, [an] extraordinary amount of time for their young ages.

Because they are unchallenged, these findings are binding. These findings sufficiently support the trial court's conclusion that there was a likelihood of future neglect.

## IV.  Conclusion

In sum, the evidence supports the trial court's findings of fact and the findings of fact are sufficient to support a conclusion of neglect as well as a conclusion that it was likely that Father's neglect of the juveniles would continue in the future. *See* N.C. Gen. Stat. § 7B-101(15) (a), (e). The court therefore did not in err in concluding that grounds existed to terminate Father's parental rights based upon neglect pursuant to N.C. Gen. Stat. § 7B-1111(a)(1).

Father does not challenge the trial court's conclusion that termination of his parental rights was in the juveniles' best interests. Accordingly, we affirm the trial court's orders.

AFFIRMED.

Judges STROUD and CARPENTER concur.

Report per Rule 30(e).